Alright, this case of the afternoon is in re to Marriage of Porter and we are joined by Amanda Bradley for the appellant and Mr. Guntran for the appellate. You may proceed. Thank you. May it please the court. Now, my name is Amanda Bradley and I represent Wakeman Porter and I will be referring to him as Wakeman and Ms. Shannon, now known as Inman, as Shannon because I feel it's very clear, especially with some name changes going on. This matter comes to you as an abuse of discretion from the order of February 22, 2019, made in Brazil. Here's the timeline. In the early 2000s, Shannon was bitten or scratched by a cat. In 2005, the clients got married and in 2008, it appeared that her wound from several years prior did not heal so she went and saw a doctor. The doctor discovered she had skin cancer. She had some surgeries. In 2010, still not healing, had more surgeries, more cancer. At some period in there, she was working and at others she was not. She injured her shoulder. In 2012, she still was not healing, had more surgeries, and the doctor did not investigate hard enough to see how deep the cancer went. By 2014, she had changed doctors and it was apparent that the cancer had terribly spread. In 2015, this married couple filed suit. There were four counts in the suit, two for Shannon's claims and two for Wakeman's claims. In June of 2017, Shannon left and filed for divorce in July of 2017, which was granted in September of 2017. Wakeman begins paying her maintenance. Sometime after that, mediation is successful in the underlying malpractice suit and it settles for $1.5 million. Out of that, the clients received $924,579.70. They couldn't agree how to divide it. So Wakeman files to divide this asset. Shannon had in the original divorce said, there is this asset out there. The first question that comes to the trial court is, is this settlement of $925,000 inside the marital estate or outside the marital estate? The trial court on September 21, 2018, almost exactly a year after divorcing the parties, says yes, it is inside the marital estate. The motion to reconsider follows and is set for hearing to occur in November. Testimony was taken and a decision was rendered in February of 2019. The decision that is rendered is no different than a young student who is taking a math class and is told, this is how we solve this math problem. You need to take what I have taught you, show me all of your work, and reach a conclusion. If the student only reaches the conclusion, the solution to the math problem, he's going to get marked out. Here, it is pretty clear that when you are dividing an asset in a marital estate, you apply 503D. You don't apply other rules. You don't apply other criteria. You are stuck inside 503D. And when you do not, you lose credit or abuse discretion, which may impinge upon my client's due process rights substantively. The reasoning behind why the DeRosa court and the courts that follow say, when you are dividing a personal injury case like this, you must apply 503D and not carve out any portions as non-marital under 503A is because it restricts the ability of the court to be sympathetic to somebody who has been injured. Instead, it is a cold application of the factors of 503D. You don't carve out a portion of it as non-marital. It is all within the marriage. It occurred during the marriage. And here it clearly did. Where this trial court has abused its discretion is first by asking, in the order of February 22nd, is this even really part of the marital estate I should be dividing? The answer was clear. It should have been. It always was. If they had not divorced, it would have been clearly money that the marriage used. But the trial court did answer that question in the affirmative. It did. It did answer the question in the affirmative. But the questioning of should I even be here is what sets it down the path of using the analytical approach, which would be an approach to use factors that are not found in our statutory scheme. We are bound by our statutory scheme. Our Supreme Court has said this over and over again. That it is not the province of the trial courts to make a deviation away from this statutory scheme. And to do so is an abuse of discretion. Now, counsel, when you talk about deviation, of course, that makes one think about child support and deviating up or down. But here, the trial court's responsibility was to divide the marital property in just proportions, considering all relevant factors, correct? Yes. And so, is it appropriate for a trial court to consider, even though it is marital property, is it appropriate for the trial court to consider the nature of the award, how it came about, the suffering, the anticipated surgeries, or things like that, that the wife in this case would anticipate? Is that inappropriate for the trial court to consider those things? It is inappropriate to put the entire Gravelman case on that issue and that issue alone. 503A and 503D do not say, well, what is the future need of the spousal surgery and rehabilitation, and what is her pain going to be? Instead, it is 12 factors that say, this is how you divide a new state. They are contained therein, but it is the appeal to looking at that sympathetic factor that becomes the analytic approach. The sympathetic factor reports, she's hurt, but you have to stick with them 503D. Such factors would be their age, their health, the duration of the marriage. If there's a prenuptial agreement, then consider provisions for children if it's applicable. Reasonable opportunity for each spouse to acquire assets in the future. However, when a court looks at things that are not listed and puts the entire emphasis on the case, it is not an equitable division and it abuses discretion. Here, the trial court has relied on the special concurrence in Hayes, and really the reasoning in Wagoner, which was overturned in the de Rosette case approximately six months after Wagoner was written. By first questioning whether it was at all, and no motion to reconsider following, the court is again questioning, do I really even have to do this? I want to apply factors outside of 503D. I really don't want to give the now-divorced parties a division that would be equitable. Furthermore, it is belied by the discussion of her future needs, and I quote, she needs additional surgeries and will have additional expenses. Moreover, the trial court had already rendered a judgment in September of 2017. At the time it said in September of 2018 that it was part of the marital estate, my client was still paying maintenance and never reconsidered the issue that my client had paid maintenance for one year. The record supports that it was a sympathetic application to give Shannon an overwhelming majority of the estate rather than the application of 503D, which is commanded by our Supreme Court in de Rosette. It carved out a portion, a very large portion, of this estate as non-marital. It is not found listed as a non-marital asset under 503A. 503A is exclusive, and no other assets are listed. The Supreme Court or the legislature wanted to include personal injury cases like this when it amended the statute after de Rosette. It would have, and it didn't. Well, counsel, could the trial court have considered these things when under 503, looking at the relevant economic circumstances of each party, that would be under five, and then also eight to the age, health, station, occupation amount, and sources of income, et cetera? Yes, they could look at the factor of whether Ms. Inman and Shannon would be able to work in the future. These people, at the time they were divorced and now, were not wealthy. They never will be unless they win a lottery. They're just simply not wealthy human beings. They made around $20,000 a year during their marriage. It also didn't consider the fact that Wakeman was the only one working for quite a while. While it was disputed how much he helped at home, the fact is it was a roof over everybody's head, food on the table, no one starved to death, and presumably, Shannon got from their home to treatment centers and gasoline was used. It doesn't consider any of those contributions. Finally, the court makes no determination of the value of Wakeman's loss of contortion. At the time that the marriage broke down in 2017, honestly, he thought everything was okay. In some ways, it almost looks like the question of if there was a dissipation in there. I don't understand that. Okay. So that basically, that he dissipated his share of this settlement by not making more money, by not supporting her more, by not doing more house chores, by not being the person who always did the laundry, by always doing the cooking and the cleaning, by always being the person who drove Shannon to and from all of her medical appointments. And because of that, he was punished by not getting an equitable share when the trial court abused his discretion by saying, I'm not even sure it belongs inside and I'm not going to apply the 503D factors. The personal nature of this case is really emphasized by Shannon's brief. I understand that it's personal, but that's why we have the mechanical approach that DeRosette set. Apply the statute, apply 503A, apply 503D, and make an equitable decision. Otherwise, you have abused your discretion. And here, that is exactly what the trial court has done. Are there any questions? No, sir. I will reserve the remainder of my time. Thank you. My name is John Duncan. I'm the attorney for Shannon Porter. I'll refer to her as Shannon and as to Whitney Porter as Whitney. Let me start by saying that, and I'm not going to try to belabor all these points, however, I think it's important for the court to realize that factually, they were married for a duration of about 11 years and 3 months. They got married in June of 2005, divorced in 2018. Their marriage had been falling apart. That was all testimony, part of the record. Wakeman admitted that he had problems and he hadn't been a good spouse. He had alcohol problems, didn't work. Shannon complained that he lied and didn't work. I find it fascinating that they placed in this lawsuit for medical malpractice. She had two counts and he had two counts. His was for loss of consortium, which is basically his status in marriage. If that actually came to trial, given what came out in our case, I don't see where he'd get much of anything in the loss of consortium claim. However, he had made his claim, she had made hers. As the courts already heard, the net amount after the 1.5 settlement for the parties came to $924,579.70. The court awarded 95% of that to Shannon, the trial court did, and 5% to Wakeman. The court heard the testimony at the trial from both of the parties. Wakeman testified, Shannon testified. They both had their day in court. The only issue before the court was this settlement money came in.  They were now divorced, but about a year after the divorce, they got the settlement from the other party. The trial judge was going to divide up that money. In doing so, he had to decide first off, this pool of money, the settlement money, they both filed this lawsuit. It wasn't marital property, it wasn't. Over 503, he had to look at that question and make that decision. He made the decision. In his order, he declared that it was marital property. Now that you've looked at that under 503A, then you go to 503D. The statute states factors that the court considers when trying to divide up marital property as well as debts. That was the job that Judge, Circuit Judge Eric Vistorius had to undertake, and he did. Not only did he get to see or get to hear the testimony of both parties, he got to see other evidence as well. The testimony, and you've already heard this, was a cat had bit Shannon's face and her lip area, and that had degenerated and turned into cancer. The doctor, she had treated her for quite some time, misdiagnosed the situation, and it had developed into cancer. By the time it was discovered, they had to start cutting out her face, part of her face. Her jaw, her face, sunken in, her nose, her upper teeth are gone. It really made a mess of her. She's had to undergo quite a few medical treatments. I believe over 17 surgeries she's had to have. Horrendous situation, a lot of hospitalization, three or four months or weeks, sorry, months, I think, of radiation treatments. She's had a recurrence several times now of this cancer. So she has to repair her face, plastic surgery, she has to get teeth implants of her face. They've got to reconstruct an upper roof and somehow be able to anchor these teeth into her face. She has a long road ahead of her. She had testified that as a result of the way she looks, she has trouble getting jobs. She's not working. She can't work. She has a lot to do in terms of her seeing doctors, medical treatment. When she goes out in public, she scares people because of the way she looks. She has a very hideous appearance. Judge Pistorius examined her. I had asked her in court for an in-court inspection by the judge of my client sitting in the witness chair. He did so. He examined her, just asked a few questions. There was no objection. It was agreed to by the other attorney for the other side. The judge also had the benefit of having interviews with no objection, pictures showing Shannon prior to this whole off the start of this, years before that. She's a beautiful woman. And then how she looks now. The judge got to see her personally, and he also had the benefit of the pictures, which you have now as part of the record. The situation was that the two of them couldn't agree on how to divide up the money now that they were divorced. The judge proceeded with looking at that evidence. He was provided with a timeline of her surgeries and medical treatments, which is part of the record. There was no objection for that. The expenses for medical treatment and the payback public aid the court has as part of the record, that is paying for what public aid had been paying for. That was paying for other medical care, as well as her attorney's fees. She has all of this money sitting there, and she has a great need to have this money utilized in the future for all of this future medical work that's going to have to be done on her. The issues of was the settlement money marital property, I think the answer is yes. The whole scenario occurred while they were married. Did the trial court correctly divide the marital property, the settlement money? We say yes, the court did. Under 503D, now that everybody knows it was marital property, the judge went over all of the relevant factors. Not every factor in 503 applied. However, the judge heard all the testimony and all the evidence. He received it that would relate to the relevant factors. Contrary to that, Mr. Wakeman produced almost nothing. What he did was he simply testified about, well, when it came to my feelings and this loss of consortium, it emotionally affected me. He testified that I was emotionally affected. Well, I asked him on cross-examination, okay, so you're emotionally affected. Did you go see a counselor, psychiatrist, doctor? No, no, I didn't think it was needed. I think it was almost his exact words. In terms of trying to prove up, well, okay, if this settlement, you're claiming part of it, how much of this settlement goes to the lost consortium? I've seen cases where you bring an expert testimony to testify in terms of doctors, counselors, psychiatrists, as to the detrimental effects on you personally, as well as to your spouse, as well as the marriage itself. Plus some kind of a dollar figure about how all this relates to maybe you've missed work. Maybe you've lost jobs. Maybe you've had all kinds of problems, and this delves into your lost consortium, as well as intimate aspects of your marriage and your relationship to your spouse. There was nothing. He brought in virtually nothing. You're a trial judge, and you're sitting there, and you're trying to apply these relevant factors. You can only do it based on the evidence that's brought into that courtroom. You just can't pull things out of thin air. Now, I think that's kind of what the argument Wakeman is now making, is that the judge is kind of pulling this out of thin air. He's doing it all out of sympathy for her. Our judge had everything in the record to give him the information as to what was going on in the marriage and for Shannon. It was up to Wakeman and his counsel to present whatever they wanted to point out to the court, these are factors that we feel are important, and here's our evidence to back it up. We did that. In our position statement, we did that. In my appellee brief, we did that for this court. You can see, and I have numbered in here, under D, 503D, you can see what factors we used and what we have to say about those factors. Based on the evidence, the testimony of the parties. Our court does not necessarily have to insert each and every thing that he thought about that affects this case. He does have to have a basis for it. He's had more than enough basis. He has to have something supported by the record. The record supports his decision in here. In terms of what contributions that he made, I think he took her one time to a medical visit in the beginning, and he visited her at a hospital when she was in for a three-week stay. He came up and visited her just one time. The person that did all of this for him, which would be contributions to the marriage, was her mother. Her mother had to come up and visit with her. Her mother had to take her back and forth. In terms of, well, they didn't miss any meals, well, of course not. They were on public aid. He didn't want to work very much. He didn't want to get up and try to make the most of himself. That was part of the arguments that they had. Instead of him sitting around and drinking, he could have been doing work. She even helped him work. And what did she get out of that? Trying to help lift up heavy plywood sheets, she damaged her shoulder. He testified she'd already had two shoulder surgeries. And there was more to come. And that was what Mr. Wakeman said, and my client agreed with it. I know it takes two to make a very good, happy partnership in a marriage. There were some children, but they never had children together. He had a daughter, and she had two boys. And they were there at the household, I think, maybe for about six years or five years. I don't see that as a major factor, and the court didn't have to take into consideration child support or any bills or anything relating to children. The judge, he knows about the duration of the marriage. He knows about the relevant economic circumstances of spouses. He even mentions in his order when he talks about their financial situation and that there probably isn't a claim out of the sum of money for lost wages because that just isn't a part of the family picture. They didn't have a lot. What they divided up under personal property, which is a factor, too, that the court has to consider, what they divided up was very, very minor. She took furniture and some things, and he took some things. They didn't own any real estate. They didn't have any major bills. She had a bill, I think, around $6,000 or $8,000 for her student loan, which is what she's going to pay. That wasn't forced on him to have to pay. The age of the parties, which the court always considers, that was clearly told to the court at the time of the trial, of our trial as to what to do with the money. Shannon was 52 years old. Wakeman was 56 years old. Her health, she testified extensively, and I summarized that in my appellate brief starting on page 7. I'm not going to read it all. In regards to the shoulder, she had back problems. She talked extensively about the reconstruction of both her face, her lips, her teeth. She suffered scarring, and they had to do debridement, get rid of scarring tissue and other things. They had to take chunks of flesh and skin out of her left arm, I believe, in order to apply that for missing skin that had been eaten up by the cancer and had to cut away. They also had to do the same thing on one of her legs. That is a very distinct possibility. It's going to have to be done again as they go back in and try to cut away and repair things. She's had problems with her breathing. She had her mouth sewed shut, and then she had to take sustenance through a straw for a very long time period. The judge heard all of that as well. She has an emotional fear the cancer's going to come back. It's already come back four times. That's in the brief. Everything in my brief that I indicate in court is documented, and I can tell you where to go on what page and what line for the court transcript. She was put into a medically induced coma, had to be kept in a Memorial Hospital burn unit up here in Springfield. As I said with the straw, that was three months that she had to go, unable to chew solid food. It's just been a bad, bad deal. Shannon's work history has been such that she hasn't had much. She hasn't made it all the way through college. She does have some college. She's done bartending. She's worked in restaurants. These aren't things you can do if you look. I hate to say it, but a woman looks hideous. It's some place where you can't cover it up unless you wear some kind of a hood. She's hoping that she can undo the damage. Wakeman didn't cause the damage, but this other doctor did, Dr. Boynon. She's trying to make do with the best that she can. What is all this going to cause? I don't know. She didn't know. Nobody knows. I've tried to get from her doctors and from her dentists, dental surgeons. How much money are we going to need? Nobody can say. They have to keep cutting in, and there's not things to anchor to. It's a big problem in terms of the needs. I've already indicated to you the needs and the concerns that she has, and I'm sure Wakeman has his needs and concerns as well. He testified that he didn't have any real serious health problems, that he had been working in the past as a construction type worker at Carpenter. As far as I know, he could very well be doing that today, but I don't know. He has the ability to go out and do things. She doesn't. Does he have needs of medical nature and future surgeries? No. She does, but he doesn't. Does the factors here limit in terms of, but you can't consider any future medical needs or whatever? That's not what the statute says. It says the needs of the parties. A need is something that I deem to be both present and future. You need it. If it's in the past, you don't need it anymore. That's over. That's the past. She's had other things that you can't necessarily quantify, pain and suffering, the past, the present, and the future. She's got the disfigurement. She's got lost enjoyment. She doesn't want to go out anywhere, go out to eat or go shopping or do anything, because she gets stared at, and people ask questions like, were you in the war? She testified to that, too. Thank you for your service for being in the war. She looks like she had half her face blown. The conclusion that I come to is the judge, and we're trying to get tied up here, well, is this an analytical approach or is this a mechanical approach? Well, quite frankly, when you look at 503A, you might get into considerations of, well, analytical, how can we say this is not a miracle or this is a miracle? Let's try to keep it not a miracle, and then that way this person can keep most of it or keep all of it. But when you go through A and you chop through that and say, no, no, this is all the statute's very clear. If it was created during the time of the marriage, then when it's the cause of action, actually, then it's miracle property. That's the presumption. That's what the statute says. And the statute says it would be miracle property unless, and this is under A, you find one of those exceptions. We went past that. Now we're into applying the factors. If you look at a factor and you say, no, no, no, no, now you're using an analytical approach. No, you're not. We're using what the factors say we can do. I think my time's up. You've got a short time to conclude. I'm not trying to belabor this, but I think what Wakeman is doing is he's trying to say, well, OK, I didn't present everything I should have. It doesn't look too good for me in court. I didn't really tie anything into any of these factors, and now that I can see that I'm not going to get half or three-quarters of what I think I deserve, I'm going to come up with this argument. And in terms of what he deserves, he didn't tell the trial court. Nor did his attorney tell the trial court, this is what I think is fair or just. This is what I'm requesting or asking. Usually you ask for some form of relief. In the trial court, he didn't. Courts divide it up. That's the way he left it. In the brief that's been filed with this court, I don't see in that brief in prayer for relief or anywhere, this is what he's asking for. This is what he deserves. This is what he needs or he should get. That's not fair. I didn't hear that argument today. What do you do when someone comes in and says, well, you're the judge. I'm not going to tell you what I want. But you decide. And when you decide if I don't like it, I'm going to appeal because you're not being fair. Well, the standard is abuse of discretion. And this court has spelled that out, abuse of discretion, and the judge even cited to it in the Burke case, Fourth District Appellate Court Burke case, that no reasonable person could come to the conclusion that the judge did that that's an abuse of discretion. Given everything that's happened in this case, I don't see that. I see that, indeed, a reasonable person can say this judge was fair and just. Thank you, counsel. Thank you, Your Honors. Rebuttal? Yes, thank you. I'm going to start at the end of his argument that Wake Mendment trial did not say, I want $400,000 or I want a specific dollar number. What we want is the correct application of 503B. We want the trial court to look at all of the factors. Wake Mendment presented evidence. We don't want a silent dissipation claim that was never filed. Dissipation must be filed according to 503B2, I believe, alerting the trial court that somebody took out of the marital estate. Instead, it's an argument that he was a drunk, he didn't work enough, and that he didn't contribute to the creation of this claim. He did, and the evidence was there. They had children. The children went to school while she was getting treated. There was food. Yes, there was a food stamp in the house, but that doesn't usually cover a family's grocery bill. They were teenagers. They had track shoes. He testified as to that. But that's getting bought down in the box. This is not a retrial of the facts. This is a question of whether the trial court abused his discretion by not looking at the factors of 503D and instead applied an analytic approach. An analytic approach would say, some of this is for the future medical cost of the person who has been injured and is outside of the marital estate. Shannon, in her brief, even said, I didn't think it should be any part at all in the estate. Despite filing in 2015 when they were married and filing no claims of dissipation and not arguing against, well, I made sure that things happened. Yes, it was a little controverted. Who did which load of laundry? I don't know, but everybody did some. She was gone for three weeks. I'm sure people didn't run around in dirty clothes. And that's the trial court's job. It's not this court's job to listen to a reiteration of the facts. Rather, it is this court's job to see the trial judge no different again than the math student. Take this math problem, apply what I've taught you, and show me your solution. You apply something else, you're wrong. If you reach a solution without showing me these steps, you're wrong. The trial court, in its order, has approximately three lines involving Wakeman, that he was one-half of the claim and one-half of the marriage in 2015 when this was filed. All we want is an equitable chance and an equitable division using 503 A and B correctly to reach an equitable decision. It is not, in my opinion, the client's place to say, Judge, I want a certain dollar number. Does the court have any questions? No, thank you. Thank you. We'll take this matter under advisement.